# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

                                               No. CR 10-3378 JB

JOHN A. BUSH, JR.,

       Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum Filed Under Seal, filed October 3, 2011 (Doc. 34)("Sentencing Memorandum"). The Court held a sentencing hearing on October 19, 2011. The primary issues are: (i) whether the Court should grant a downward departure under U.S.S.G. § 5K2.13 based on Defendant John A. Bush, Jr.'s diminished capacity during the commission of the offense; (ii) whether the Court should grant a downward departure under U.S.S.G. § 5H1.4 based on Bush's alcohol dependence; (iii) whether the Court should accept the parties' stipulation that U.S.S.G. § 3C1.2 does not apply to the facts of this case; and (iv) whether the Court should vary downward on Bush's sentence. The Court will grant the requests in part and deny the requests in part. The Court will deny a departure under U.S.S.G. § 5K2.13 for diminished capacity, because Bush's diminished capacity resulted in part from his

---

[1]In its Sealed Memorandum Opinion and Order, filed January 4, 2012 (Doc. 46)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO. See Sealed MOO at 1 n.1. The Court gave the parties ten working days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

voluntary use of alcohol and because of the violent nature of the crime. The Court will deny a departure under U.S.S.G. § 5H1.4 based on Bush's alcohol abuse, as a departure on this basis is disfavored and the Court does not believe Bush's case falls outside of the heartland of cases in this regard. The Court will accept the parties' stipulation that U.S.S.G. § 3C1.2 does not apply to this case, as the Court does not believe that Bush recklessly created a substantial risk of death or serious bodily injury to the officers who subdued him within the contemplation of this guideline. Because the Court believes there are a variety of mitigating factors in this case, the Court will vary downward on Bush's sentence to a sentence of 30-months imprisonment.

**FACTUAL BACKGROUND**

On November 24, 2010, shortly before midnight, on Kirtland Air Force Base in Albuquerque, New Mexico, Bush became agitated and began throwing things in the apartment he shared with his wife, Maxine Velasquez, and young son. <u>See</u> Presentence Investigation Report ¶ 9, at 4, disclosed August 11, 2011 ("PSR"). He was under the influence of alcohol. <u>See</u> PSR ¶ 13, at 6. Bush became angry because his wife was "going out with some friends for the evening" and he "offered to pay for a cab since they had all been drinking alcohol as well," after which Velasquez "refused to allow [him] to pay pointing out that [he] was unemployed in front of [their] guests." PSR ¶ 13, at 6. His wife went to retrieve their son, but in a state of emotional distress and panic, Bush cut his wife on the face and wrist with a large kitchen knife. <u>See</u> PSR ¶ 9, at 4-5. She sustained an approximately two centimeter cut to her right thumb and a ten centimeter cut to her forehead. <u>See</u> PSR ¶ 9, at 5. Another person in the house was able to restrain Bush. <u>See</u> PSR ¶ 9, at 5. Bush eventually left the residence, and officers attempted to stop him from leaving the Kirtland Base. <u>See</u> PSR ¶ 8, at 4. As they attempted to do so, he ran out of his vehicle, shouting at the officers and telling them to kill him. <u>See</u> PSR ¶ 8, at 4. Officers gave him verbal commands to drop

-2-

the knife, and he refused.  See PSR ¶ 8, at 4.  Officers then shot Bush with a non-lethal round from

a bean bag gun to incapacitate him.  See PSR ¶ 8, at 4.  Bush dropped the knife, but an officer had

to kick Bush to deny him access to the knife.  See PSR ¶ 8, at 4.  Two breathalyzer tests taken after

the incident indicated that Bush had a blood alcohol content of .15 and .16.  See PSR ¶ 8, at 4.

Velasquez reported to the United States Probation Office ("USPO") that Bush had abused

her several times during their marriage, including physically abusing her and striking her during her

pregnancy.  See PSR ¶ 10, at 5.  At some times, Bush and Velasquez' relationship would improve.

See PSR ¶¶ 10-11, at 5-6.  In May 29, 2009, during a party at their residence, he threatened to kill

her with a screwdriver.  See PSR ¶ 11, at 5.  The following day, he started a fire at their residence,

and was temporarily barred from the Kirtland Base.  See PSR ¶ 11, at 5-6.  Velasquez reported that,

in the summer of 2010, Bush threatened to shoot her, their son, their dog, and himself.  See PSR

¶ 11, at 6.

## PROCEDURAL BACKGROUND

Bush, pursuant to a Plea Agreement, filed June 8, 2011 (Doc. 28), pled guilty to the

Information, filed June 8, 2011 (Doc. 25), charging him with a violation of 18 U.S.C. § 113(a)(6),

that being assault resulting in serious bodily injury.  The Plea Agreement stipulates that a 4-level

enhancement to Bush's offense level under U.S.S.G. § 2A2.2(b)(2)(B) is appropriate, "because a

dangerous weapon was otherwise used in the offense."  Plea Agreement ¶ 10, at 4.  The Plea

Agreement stipulates that a 5-level enhancement to Bush's offense level under U.S.S.G.

§ 2A2.2(b)(3)(B) is appropriate, "because the victim sustained serious bodily injury."  Plea

Agreement ¶ 10, at 4.  The parties also agreed that "[t]he provisions of U.S.S.G. § 3C1.2 should not

apply in this case."  Plea Agreement ¶ 10, at 4.  The parties agreed to a 3-level reduction to Bush's

offense level under U.S.S.G. § 3E1.1 based on Bush's acceptance of responsibility "so long as the

Defendant continues to accept responsibility for the Defendant's criminal conduct." Plea Agreement ¶ 10, at 4-5. "Apart from the stipulations set forth in" the Plea Agreement, the parties "reserve[d] their rights to assert any position or argument with respect to the sentence to be imposed." Plea Agreement ¶ 10, at 5-6.

The USPO disclosed a PSR for Bush on August 11, 2011. In the PSR, the USPO calculates Bush's total offense level to be 20. See PSR ¶ 28, at 9. The PSR applies a base offense level of 14 under U.S.S.G. § 2A2.2(a). See PSR ¶ 19, at 8. The PSR includes a 4-level upward adjustment under U.S.S.G. § 2A2.2(b)(2)(B), because "the defendant used a knife to stab the victim in the right thumb and forehead." PSR ¶ 20, at 8. The PSR includes a 5-level upward adjustment under U.S.S.G. § 2A2.2(b)(3)(B), because the victim "sustained serious bodily injury." PSR ¶ 21, at 8. The USPO indicates that a 2-level enhancement under U.S.S.G. § 3C1.2 is appropriate, because Bush "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement." PSR ¶ 22, at 8-9. The USPO does not apply this 2-level enhancement, however, because the parties agreed that it did not apply. See PSR ¶ 22, at 8-9. The PSR includes a 3-level reduction under U.S.S.G. § 3E1.1 based on Bush's acceptance of responsibility. See PSR ¶ 27, at 9. The PSR lists his criminal history category as I, based on 0 criminal history points. See PSR ¶ 31, at 9. The PSR calculates that an offense level of 20 and a criminal history category of I results in a guideline imprisonment range of 33 to 41 months. See PSR ¶ 50, at 12. On September 14, 2011, the USPO disclosed an Addendum to the PSR, which further discusses the impact the crime had on the victim, Velasquez. The USPO also addresses Bush's informal objections to the PSR regarding certain statements Velasquez made relating to events before the offense. See Addendum to PSR at 1. The USPO does not change the PSR in response to these objections. See Addendum to PSR at 1.

-4-

On October 3, 2011, Bush submitted his Sentencing Memorandum.  Bush requests that the Court impose a sentence of 18-months imprisonment.  See Sentencing Memorandum at 6.  Bush recounts the events leading up to the stabbing.  See Sentencing Memorandum at 1-2.  He argues that, upon closer evaluation, "it is evident that the circumstances of John Bush's life leading to the events of November 24 show that the causal factors of this event date back well before November 24 and that these factors have been misunderstood or ignored by John Bush for quite some time." Sentencing Memorandum at 2.  Bush's "biological father left home when he was 2 years old and did not reappear in John's life until he was graduating from high school."  Sentencing Memorandum at 2 (citing Forensic Psychological Diminished Capacity Evaluation by Dr. Eric Westfried at 2 (dated September 14, 2011)("Report")).  Bush believes that "he is the reason his parents['] marriage failed."  Sentencing Memorandum at 2 (citing Report at 2).  His mother then became involved with a man named Stanley Cain, who "had a strong influence on John and is one reason John joined the military."  Sentencing Memorandum at 2 (citing Report at 3).  "Stanley left the home when John was around nine years old," and "John believes he was to blame for Stanley leaving."  Sentencing Memorandum at 2 (citing Report at 3).  "[A]t the age 13 John was the victim of sexual abuse at the hands of his mother's boyfriend, Paul Archibald, who also happened to be the deacon of their church."  Sentencing Memorandum at 2 (citing Report at 3).  Bush's mother then left this man, which has also "manifested it self [sic] in John's mind as him being to blame for a father figure leaving him."  Sentencing Memorandum at 2 (citing Report at 3).  He asserts that this event "also led to John's first self reported attempt at suicide."  Sentencing Memorandum at 2-3 (citing Report at 8).  "At his high school graduation John's biological father c[ame] back into his life just long enough to tell John he does not want him in his life."  Sentencing Memorandum at 2-3.

He contends that these events put his conduct on November 24, 2010 in perspective, because

"when his wife Maxine was going to take his child from their home John saw his failure as a father as him doing to his son what these men had done to him." Sentencing Memorandum at 3. He asserts that "[t]his event ended with John's most recent attempt at suicide by him begging the Albuquerque Police Officers to shoot him." Sentencing Memorandum at 3 (citing PSR ¶ 8, at 4). He notes that, "[w]hile serving guard duty at the gate to the Del Rio Texas Air Force Base," he "suffered another type of trauma" in the form of being "the first on the scene of a horrific accident nearby the gate where he witnessed two young children crushed to death." Sentencing Memorandum at 3 (citing Report at 4). He asserts that "[i]t was after the incident at Del Rio that John began abusing alcohol and eventually was discharged from the military as being unfit for duty." Sentencing Memorandum at 3 (citing Report at 3). He reports that, after leaving the military and moving to Germany with his former wife, he "was placed in a psychiatric hospital for one week" where "[h]is diagnosis appears to have been depression." Sentencing Memorandum at 3. He notes that there was no diagnosis of post-traumatic stress disorder in Germany. See Sentencing Memorandum at 3-4. He asserts that, pointing to Dr. Eric Westfried's Report, doctors there should have diagnosed him with this disorder. See Sentencing Memorandum at 3-4 (citing Report at 11-13). He argues that the event where he stabbed Velasquez resulted from his feeling of being a "failure as a father" when his "then wife Maxine refused to accept his offer of money for a taxi ride," because he "was unemployed" and she did not want him "to spend his money he had saved for Christmas presents on her cab fare." Sentencing Memorandum at 4. He asserts that his "frustration took over and his behavior became irrational." Sentencing Memorandum at 4. He argues that his conduct resulted from repression of his problems which cost him his "mental well being" and caused him "to start using alcohol in excess." Sentencing Memorandum at 4. He states that "this is a common response to persons suffering from" post-traumatic stress disorder.

Sentencing Memorandum at 4.  He contends that, "[a]s outlined in Dr. Westfried's report, had" he "not been suffering from" post-traumatic stress disorder "with the accompanying alcohol dependence the events of November 24, 2010, would almost assuredly have unfolded quite differently."  Sentencing Memorandum at 5.  He directs the Court to various letters people have sent in on his behalf.  See Sentencing Memorandum at 5.

Dr. Westfried provided his Report separately from Bush's sentencing memorandum.  The USPO attached a copy of this Report to the Second Addendum to the PSR, which the USPO disclosed on October 12, 2011.  Dr. Westfried discusses whether Bush had diminished capacity as defined by U.S.S.G. § 5K2.13 when he committed the offense.  See Report at 1.  Dr. Westfried provides an opinion that "Mr. Bush's state of mind at the time of the instant offense was affected by alcohol and his being in an episode of major depression and post traumatic disorder.  Clinically, at the time his capacity to exercise reason and control his behavior was impaired by a mental disorder and intoxication."  Report at 1.  Dr. Westfried discusses in detail Bush's personal, educational, employment, marital, and health history.  See Report at 2-5.  Dr. Westfried discusses the incident in Germany where Bush was hospitalized.  See Report at 6.  Dr. Westfried notes that Bush has made several attempts to kill himself in the past, including by cutting his wrists and trying to poison himself by swallowing toothpaste.  See Report at 6.  Dr. Westfried mentions that Bush did not consume alcohol until the day after he observed the two children die in Del Rio.  See Report at 6.  Bush reported to Dr. Westfried that his alcohol abuse progressed after the incident, which eventually resulted in his discharge from the military.  See Report at 6.  Bush told Dr. Westfried that he would drink a fifth of liquor a day for the next four years.  See Report at 6.

Bush informed Dr. Westfried that he has nightmares three or four times a week, mostly involving the kids who were killed at Del Rio, friends he has lost to suicide, Velasquez' best friend

dying, and people coming after his son.  See Report at 8.  Bush told Dr. Westfried that he had

attempted suicide approximately fifteen times.  See Report at 8-9.  Dr. Westfried concluded in his

examination that Bush had no gross cognitive defects or impairment.  See Report at 9.  Bush scored

above average when Dr. Westfried evaluated his attention and concentration, his memory functions,

and his executive functioning, which includes performing activities like problem solving, planning

and organization, and other higher level cognitive functions.  See Report at 10.  During a

psychological evaluation, Bush expressed many signs of severe depression as well as signs of

anxiety and paranoia.  See Report at 1.  Dr. Westfried noted that "[h]is overall profile was that of

someone who has a significant history of drinking problems and is quite unhappy and pessimistic

with a proneness to ruminate about his life experiences and feel guilty."  Report at 11.  Dr. Westfried

further reported that Bush's "profile was associated with people who are severely depressed,

discouraged, and withdrawn, being plagued by thoughts of worthlessness, hopelessness, and

personal failure."  Report at 11-12.  Dr. Westfried commented on Bush's reports of "trauma related

flashbacks and nightmares," along with his "anxiety and depression," which are "typical to a post-

traumatic stress disorder."  Report at 12.  Dr. Westfried's evaluations of whether Bush has post-

traumatic stress disorder led him to the conclusion that Bush likely suffers from this disorder.  See

Report at 12.  Dr. Westfried noted, however, that "due to the likely symptom magnification those

results are not conclusive as an objective measure."  Report at 12.  Taking Bush's alcohol abuse and

post-traumatic stress disorder into account, Dr. Westfried concludes that "at the time of the instant

offense Mr. Bush had a major mental disorder that was affecting his ability to manage his feelings,

thoughts, and behaviors."  Report at 14.

 In a letter dated October 3, 2011, Velasquez wrote the Court that she would "support [its]

decision if [it] decided to continue to allow [Bush] to have a relationship with [their] son."  Letter

to the Court from Maxine Velasquez at 2 (dated October 3, 2011), filed October 11, 2011 (Doc. 45)("Oct. 3, 2011 Letter"). She contends that Bush "is a good father" and "has been an active part of his" son's life. Oct. 3, 2011 Letter at 2. She states that she feels "it will be greatly important for" Bush "to support" his son's "progress in a positive way by becoming a positive influence in" his life. Oct, 3, 2011 Letter at 2. She requests that the respective arrangements be made through a third party as stated in Velasquez' and Bush's divorce decree. Oct. 3, 2011 Letter at 2.

On October 17, 2011, Plaintiff United States of America filed its United States' Response to Defendant's Sentencing Memorandum Filed Under Seal. See Doc. 37 ("Response"). The United States asserts that Velasquez now bears a scar across her forehead from Bush's assault. See Response at 2 (citing Addendum to PSR at 2). It also notes that she required surgery for the injuries to her thumb, which "will never again have full mobility," and had to wear a cast for three months. Response at 2 (citing Addendum to PSR at 2). The United States opposes Bush's request for a sentence of 18-months imprisonment. See Response at 2. It requests a sentence "within the Guidelines range of 33 to 41 months imprisonment." Response at 2. The United States asserts that varying on Bush's sentence because of Dr. Westfried's diagnoses would be inappropriate, particularly given that Dr. Westfried indicated that Bush "complains of more distress than is probably objectively accurate." Response at 3 (quoting Report at 14). The United States notes that, while Bush has no prior criminal history, he has assaulted and abused his wife numerous times in the past. See Response at 3. The United States recognizes that, "[w]hile it may be true that Defendant suffers from mental illness, the fact remains that Defendant is a dangerous person who has continued to threaten Ms. Velasquez, even since he has been in custody on the instant offense." Response at 3. The United States directs the Court to an attached letter Bush wrote to his son after the incident, which it contends shows his aggressive and violent nature. See Response at 3-4 (citing

Letter to Jason Bush from John A. Bush, Jr. at 1 (dated May 1, 2011), filed October 17, 2011 (Doc. 37-1)("May 1, 2011 Letter")).  The United States quoted the following portion of the May 1, 2011 Letter:

> Your mother's face and hand are apparently my handiwork. I don't remember jackshit really past arguing over money, but she got what she deserved.  33-41 months is what they want me to plead to, but that aint [sic] happening.  First, that takes me out of your life for good, second, it's started a vengeance package, and third, that bitch should have learned to hold her tongue.  I may be a jobless loser, but after I get out of here, she will wish she never even had you. . . . After I get my revenge, your mother will be as fucked up mentally as I am.  You should have never happened, your whole existence caused me to hate myself. . . . Your mother and friends will forever wish they had never spoken about anything.

Response at 4 (alteration in original)(citing May 1, 2011 Letter at 1).  The United States asserts that, "[w]hile it is unfortunate that Defendant had a troubled childhood and other difficulties in his life, Defendant's trouble past and mental health diagnoses cannot justify his actions in assaulting his wife."  Response at 4.

At the sentencing hearing on October 19, 2011, the parties agreed to the Court reducing Bush's offense level a third level for acceptance of responsibility.  See Transcript of Hearing at 3:5-15 (taken October 19, 2011)(Court, Brawley, Loonam)("Tr.").[2]  Bush clarified that he was requesting a downward departure under both U.S.S.G. §§ 5K2.13 and 5H1.4.  See Tr. at 3:22-4:8 (Court, Loonam).  The Court noted that U.S.S.G. § 5K2.13 states that it does not apply to cases involving a need to protect the public where the offense involved actual violence.  See Tr. at 4:20-23 (Court).  The Court expressed its concern that a departure under U.S.S.G. § 5K2.13 is not appropriate when the defendant's significantly reduced mental capacity results from the use of drugs or other intoxicants.  See Tr. at 4:11-19 (Court).  The Court recognized that Bush has some serious

---

[2]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

mental and emotional problems, but questioned whether Bush fit the criteria for a departure under this guideline.  See Tr. at 5:2-14 (Court).  Bush contended that this guideline operates somewhat differently than other departures and does not provide a bright line for its application.  See Tr. at 5:15-6:7 (Loonam).  Bush emphasized that he had never received an accurate diagnosis for post-traumatic stress disorder and thus could not have known the effects of that condition.  See Tr. at 6:12-7:10 (Loonam).  Bush argued that there were more influences controlling his behavior than alcohol.  See Tr. at 7:10-19 (Loonam).  The United States contended that U.S.S.G. § 5K2.13's plain language forecloses its application in this case, particularly given Bush's voluntary use of alcohol which reduced his mental capacity, and the crime's violent nature.  See Tr. at 11:4-22 (Brawley).  The United States asserted that Bush did not receive the mental treatment he needed and that, in some ways, he is responsible for his psychological problems contributing to this incident.  See Tr. at 11:23-12:14 (Brawley).  Bush noted that he has already received an enhancement for the crime's violent nature and that the crime's nature should not preclude a departure under U.S.S.G. § 5K2.13.  See Tr. at 13:3-14:3 (Loonam).  The Court then denied the departure under U.S.S.G. § 5K2.13.  See Tr. at 14:4-15:15 (Court).

Bush then argued that a departure under U.S.S.G. § 5H1.4 was appropriate based on his alcohol problems, particularly given the significant trauma in his background.  See Tr. at 15:19-17:17 (Loonam).  Bush asked the Court to take the circumstances of this case in the context of the factors in 18 U.S.C. § 3553(a), which direct a court to impose a sentence that is sufficient but not greater than necessary.  See Tr. at 17:18-18:21 (Loonam).  Bush asserted that, while he was in the military, he learned not to express his emotions or discuss his feelings, which led to some of his current problems.  See Tr. at 19:7-20:10 (Loonam).  He requested that the Court consider his years of service in the military when arriving at a sentence.  See Tr. at 21:9-14 (Bush).  The United States

-11-

argued that U.S.S.G. § 5H1.4 recognizes that departures based on substance abuse are disfavored, because substance abuse increases a person's propensity to commit crimes.  See Tr. at 21:18-22:7 (Brawley).  The Court then denied the request for a departure under U.S.S.G. § 5H1.4.  See Tr. at 22:13-23:23 (Court).  The Court then asked the parties to provide a factual basis in support of its stipulation that U.S.S.G. § 3C1.2 does not apply to this case.  See Tr. at 24:5-7 (Court).  Bush contended that he posed a greater risk to himself than the officers, as he was acting in a suicidal manner.  See Tr. at 24:12-25:7 (Loonam).  He emphasized that this guideline addresses more extreme behavior than that in which he engaged on the night of the offense.  See Tr. at 24:15-25:7 (Loonam).  The United States agreed that Bush posed a greater risk to himself than the officers.  See Tr. at 25:10-17 (Brawley).  The Court then accepted the parties' stipulation and discussed precedent it had reviewed from the United States Court of Appeals for the Tenth Circuit that led the Court to the conclusion that an enhancement under U.S.S.G. § 3C1.2 would not apply to this case.  See Tr. at 26:10-22 (Court).

During a discussion of the appropriateness of a variance from the advisory guideline range, the Court discussed its concern about the letter Bush sent to Velasquez following the commission of the offense.  See Tr. at 27:3-21 (Court).  Bush noted that Velasquez has requested that the Court not prevent him from being involved in his son's life and has a better understanding of Bush than anyone else.  See Tr. at 28:10-29:9 (Loonam, Court).  Bush noted that she wrote the Court and did not request a high sentence.  See Tr. at 29:10-25 (Loonam).  Bush asked the Court to consider the effect his mental condition had on his behavior.  See Tr. at 30:1-13 (Loonam).  The Court inquired whether, as indicated in Dr. Westfried's Report, Bush may be exaggerating some of his problems.  See Tr. at 30:14-23 (Court).  Bush emphasized the sensitive and imprecise nature of some of these determinations as well as the complex effect his experiences have had on him.  See Tr. 30:24-32:13

(Loonam).  The United States contended that it is opposed to any variance and asserted that it would be satisfied with a sentence of 33-months imprisonment.  See Tr. at 33:19-24 (Brawley).  The United States noted that this crime is a serious one with a maximum sentence of 10-years imprisonment. See Tr. at 33:25-34:3 (Brawley).

## LAW REGARDING U.S.S.G. § 5K2.13

U.S.S.G. § 5K2.13 provides the following policy statement:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.  Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.
>
> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

U.S.S.G. § 5K2.13.  Application note 1 to U.S.S.G. § 5K2.13 provides that, for purposes of this policy statement, "'significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."  U.S.S.G. § 5K2.13 cmt n.1.  Diminished capacity is an "encouraged" factor -- a specific factor provided by the Commission "'to aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines.'"  United States v. Neal, 249 F.3d 1251, 1256 (10th Cir. 2001)(citing U.S.S.G. § 5K2.0).  In the case of an encouraged factor, "the court is authorized to depart if the applicable Guideline does not already take

-13-

it into account." United States v. Neal, 249 F.3d at 1256.  Accord United States v. Trejo-Lara, No.

07-1456, 2008 WL 2397672, at *2 (D.N.M. Jan. 30, 2008)(Browning, J.).

## LAW REGARDING U.S.S.G. § 5H1.4

U.S.S.G. § 5H1.4 provides: "Drug or alcohol dependence or abuse ordinarily is not a reason

for a downward departure."  U.S.S.G. § 5H1.4.  The United States Sentencing Commission has

recognized: "Substance abuse is highly correlated to an increased propensity to commit crime.  Due

to this increased risk, it is highly recommended that a defendant who is incarcerated also be

sentenced to supervised release with a requirement that the defendant participate in an appropriate

substance abuse program . . . ."  U.S.S.G. § 5H1.4.  The Tenth Circuit has noted that departures on

the basis of drug or alcohol abuse are "disfavored."  United States v. Sayad, 589 F.3d 1110, 1118

n.4 (10th Cir. 2009).  Before the decision in United States v. Booker,  543 U.S. 220 (2005), the

Tenth Circuit described a departure on this basis as "forbidden."  United States v. Concha, 294 F.3d

1248, 1251 & n.2 (10th Cir. 2002).

## LAW REGARDING U.S.S.G. § 3C1.2

U.S.S.G. § 3C1.2 provides for a 2-level enhancement when "the defendant recklessly created

a substantial risk of death or serious bodily injury to another person in the course of fleeing from

a law enforcement officer."  U.S.S.G. § 3C1.2.  Accord United States v. Osborne, 593 F.3d 1149,

1152 (10th Cir. 2010).  A defendant acts recklessly for purposes of this enhancement when he "was

aware of the risk created by his conduct and the risk was of such a nature and degree that to

disregard that risk constituted a gross deviation from the standard of care that a reasonable person

would exercise in such a situation." United States v. Conley, 131 F.3d 1387, 1389 (10th Cir. 1997).

The Tenth Circuit has recognized that "[n]ot every flight from a crime scene, of course, will

constitute reckless endangerment under § 3C1.2." United States v. Conley, 131 F.3d at 1390.  The

-14-

Tenth Circuit's precedent indicates that the most common cases where courts apply this guideline involve high-speed car chases.  See United States v. Osborne, 593 F.3d at 1153-54; United States v. Gaylord, 61 F.App'x 623, 624-25 (10th Cir. 2003)(unpublished); United States v. Ramsay, 17 F.App'x 776, 777-78 (10th Cir. 2001)(unpublished); United States v. Conley, 131 F.3d at 1389-90; United States v. Kirkhart, 129 F.3d 131, 1997 WL 687657, at *1-2 (10th Cir. 1997)(unpublished table decision).  The Tenth Circuit also found the application of this guideline appropriate in a case where a defendant during escape disposed of a firearm in a "water turn-off hole" that was near the presence of children.  United States v. Brown, 314 F.3d 1216, 1221 (10th Cir. 2003).

## ANALYSIS

The Court will deny a departure under U.S.S.G. § 5K2.13 for diminished capacity, because the diminished capacity resulted in part from Bush's voluntary use of alcohol and because of the crime's violent nature.  The Court will deny a departure under U.S.S.G. § 5H1.4 based on Bush's alcohol abuse as a departure on this basis is disfavored and the Court does not believe Bush's case falls outside of the heartland of cases in this regard.  The Court will accept the parties' stipulation that U.S.S.G. § 3C1.2 does not apply to this case, as the Court does not believe that Bush, within the contemplation of this guideline, recklessly created a substantial risk of death or serious bodily injury to the officers who subdued him.  Because the Court believes there are a variety of mitigating factors in this case, the Court will vary downward on Bush's sentence to a sentence of 30-months imprisonment.

**I.      THE COURT WILL NOT DEPART DOWNWARD UNDER U.S.S.G. § 5K2.13, AS BUSH VOLUNTARILY CONSUMED ALCOHOL IN A WAY THAT CONTRIBUTED TO HIS DIMINISHED CAPACITY AND BECAUSE OF THE CRIME'S VIOLENT NATURE.**

U.S.S.G. § 5K2.13 provides: "A downward departure may be warranted if (1) the defendant

committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13 excepts from this rule situations where: "(1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; [or] (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence . . . ."  U.S.S.G. § 5K2.13.

Both of these exceptions to a departure based on diminished capacity apply to this case.  It is not in dispute that Bush has some significant mental problems, which contributed in part to Bush's commission of the offense.  It is not clear, however, that his mental problems affected his ability to: (i) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (ii) control behavior that he knew was wrongful.  See U.S.S.G. § 5K2.13 cmt n.1.  There is no evidence that Bush did not understand that what he did was wrong or that his mental problems affected his ability to control behavior that was wrongful.  While there is evidence that his mental problems affect his ability to control his behavior, he also has a significant alcohol abuse problem.  Bush has a documented history of alcohol abuse.  More importantly, there is evidence that he had a blood alcohol content of roughly .15 or .16 on the night he assaulted Velasquez.  If Bush had not consumed alcohol at all on the night he assaulted Velasquez or had a lower blood alcohol content, the Court might have some basis to justify a departure based on Bush's mental problems.  The large amount of alcohol Bush consumed, however, counsels against a departure in this case.  The more significant factor that might have supported a departure is his mental problems rather than his excessive use of alcohol.  Given the large amount of alcohol Bush frequently consumes, he likely has a high tolerance for alcohol.  Consuming that amount of alcohol may not have affected his ability to understand the wrongfulness of the behavior comprising the offense or to exercise the

power of reason, but apparently may have affected significantly his ability to control behavior that he knew was wrongful.  See U.S.S.G. § 5K2.13 cmt n.1.

Additionally, this crime involved actual violence, which the Sentencing Commission has recognized counsels against a departure under this guideline.  Bush assaulted Velasquez with a knife.  While he did not fatally injure her, he caused some significant injuries.  Likewise, Bush has a history of assaulting Velasquez, which increases the risk that Bush poses a threat to the public. Bush also used a dangerous weapon, a knife, as opposed to just his fists.  A knife can cause serious injuries to other and creates significant dangers to the public, even if the knife was just a kitchen knife.  Consequently, the Court does not believe that a departure under U.S.S.G. § 5K2.13 is warranted.

While the Court recognizes that U.S.S.G. § 5K2.13 expressly authorizes a departure, the Court does not believe that the circumstances warrant a departure.  Unfortunately, our prisons are full of convicted persons with severe mental problems who have had hard lives that precede their crimes.  The Court has trouble distinguishing Bush's troubled and tragic background from that of many other defendants who appear before the Court.  In sum, Bush remains within the heartland of defendants who appear before the Court.  Moreover, even if a departure were warranted, the Court would exercise its discretion not to depart, because of its view that Bush continued to know that what he was doing was wrong and that his mental problems did not affect his ability to control behavior he knew was wrongful as much as his alcohol abuse contributed to that situation. Additionally, this was also a violent crime that implicates the Court's obligation to protect the public.

## II.      THE COURT WILL NOT DEPART DOWNWARD UNDER U.S.S.G. § 5H1.4 BASED ON BUSH'S ALCOHOL ABUSE PROBLEMS.

U.S.S.G. § 5H1.4 provides: "Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure."  U.S.S.G. § 5H1.4.  The Sentencing Commission has recognized: "Substance abuse is highly correlated to an increased propensity to commit crime.  Due to this increased risk, it is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program . . . ."  U.S.S.G. § 5H1.4.  The Tenth Circuit has noted that departures on the basis of drug or alcohol abuse are "disfavored."  United States v. Sayad, 589 F.3d at 1118 n.4.

While departures under this policy statement are permissible, they are not favored.  The Court believes that, to justify a departure under this policy statement, there needs to be an unusual and atypical level of drug dependence that distinguishes the case from other typical cases.  Bush has alcohol abuse problems, but the Court does not believe they rise to the level necessary to justify a departure under this guideline.  Many cases involve alcohol dependence and alcohol abuse, so it is difficult to justify a departure on those bases absent compelling circumstances, such as extreme physical dependence on alcohol comparable to a physical impairment.  Furthermore, as the Sentencing Commission has recognized, "[s]ubstance abuse is highly correlated to an increased propensity to commit crime."  U.S.S.G. § 5H1.4.  Granting departures too readily under this guideline could have undesirable effects by failing to deter culpable behavior.

The Court does not believe that the circumstances warrant a departure under this guideline. Many defendants before the Court have severe substance abuse problems and commit crimes while under the influence.  The Court has trouble distinguishing Bush's substance abuse problem from that of many other defendants who appear before the Court.  In sum, Bush remains within the heartland

-18-

of defendants who appear before the Court.  Moreover, even if a departure were warranted, the Court would exercise its discretion not to depart, because the crime was highly affected by alcohol abuse and he remains a risk unless the problem is addressed.  The Court believes that supervised release with conditions that require Bush to participate in a program for substance-abuse treatment appears to be the better way to address the alcohol problems rather than reducing his sentence of incarceration.

III.    **THE COURT WILL ACCEPT THE PARTIES' STIPULATION THAT U.S.S.G. § 3C1.2 DOES NOT APPLY TO THIS CASE, AS THE COURT AGREES THAT THIS GUIDELINE IS NOT APPLICABLE.**

While the parties have agreed that a 2-level enhancement under U.S.S.G. § 3C1.2 should not apply to this case, the USPO has indicated that a 2-level enhancement under this guideline should apply.  The Court believes that the parties' stipulation accurately reflects the application of this guideline.  U.S.S.G. § 3C1.2 provides for a 2-level enhancement when "the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer."  U.S.S.G. § 3C1.2.  Accord United States v. Osborne, 593 F.3d at 1152.  A defendant acts recklessly for purposes of this enhancement when he "was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise  in such a situation."  United States v. Conley, 131 F.3d at 1389.

The Court agrees with the parties that Bush posed a greater risk to himself than he did to the officers.  While Bush was in possession of a knife when the officers subdued him, there is little indication that he attempted to use or intended to use the knife on the officers.  It is true that one of the officers had to further subdue him to ensure that Bush did not have access to the knife.  There was, like in many cases where officers subdue a suspect, a risk of harm to the officers.  For this

-19-

guideline to apply, however, it is necessary that "the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2.  It is difficult for the Court to conclude that the risk of death or serious bodily injury was substantial given Bush took no actions to attack the officers.  While he told the officers to shoot him, that is not the same thing as trying to attack the officers with a knife while fleeing.  Additionally, it is somewhat difficult to say that Bush "was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." United States v. Conley, 131 F.3d at 1389.  Bush was in a confused and drunken mental state, so he may not have been fully aware of the risk he created.  He appeared more interested in creating enough concern to get himself killed rather than intentionally threatening the officers.  Furthermore, while Bush likely behaved in a negligent manner when the officers subdued him, his conduct was not likely a gross deviation from the applicable standard of care.  He did not approach the officers with a weapon or engage in behavior that posed a serious risk to the officers.  He mostly put his own life at risk by acting foolishly.

Whenever police subdue a fleeing suspect, there will be some risk.  The Tenth Circuit has recognized, however, that "[n]ot every flight from a crime scene, of course, will constitute reckless endangerment under § 3C1.2."  United States v. Conley, 131 F.3d at 1390.  This case is not one where Bush entered a vehicle and drove at high speeds in a manner that would endanger officers or the public -- a case that more readily involves application of this guideline.  Likewise, there is no indication that there were bystanders around who would have been placed at risk by Bush's behavior.  While Bush engaged in behavior that posed some risk to the officers, the nature of the risk he posed does not make his conduct fall within U.S.S.G. § 3C1.2's contemplation.

IV.     **BECAUSE OF THE MITIGATING CIRCUMSTANCES SURROUNDING BUSH'S OFFENSE, THE COURT WILL DEPART DOWNWARD TO A SENTENCE OF 30-MONTHS IMPRISONMENT.**

After reducing Bush's offense level a third level for acceptance of responsibility, he has an offense level of 20.  An offense level of 20 and a criminal history category of I results in a guideline imprisonment range of 33 to 41 months.  The Court has carefully considered the parties' arguments and the circumstances of this case.  The Court has considered the guideline range for the applicable category of offense committed by the applicable category of defendant.  The Court believes that the punishment that the guidelines set forth is not appropriate for Bush's offense.  The Court, however, does not believe that Bush's requested sentence of 18 months is appropriate.  The Court believes that a sentence of 30 months is sufficient to reflect the seriousness of this offense.  Bush's crime is a serious one that involves violence against his former wife.  The Court is most hesitant to vary downwards on sentences for crimes involving violent behavior.  As detailed in Dr. Westfried's Report, however, Bush has a troubled history, various forms of trauma in his life, some significant mental and emotional problems, and a series of suicide attempts.  Those circumstances make his case somewhat different than other violent offenders that come before the Court.  The Court has dealt with, however, many defendants who have alcohol problems as well as psychological problems.  While the Court does not believe that Bush's sad background, resulting mental problems, and substance abuse problems justify departures, because he still remains in the heartland of cases, the Court concludes that a slight variance is appropriate to reflect these factors.  Bush has also given some service to his country in the military, which indicates that he has an understanding of the importance of giving back to society and that he will likely be a better candidate for rehabilitation than other defendants before the Court.  Prison is not an appropriate facility for rehabilitation, and a shorter sentence will get him sooner into supervised release.  The conditions the Court will impose

as part of supervised release will help him address his mental illness and his substance abuse problems. Another reason to vary is that Bush has, to date, not had any therapy or been a part of any programs as extensive as those he will receive while under the USPO's direction.

The Court has considered the guidelines, but, in arriving at its sentence, has taken into account not only the guidelines but other sentencing goals. Other conditions that the Court will require as part of supervised release will also provide Bush with some needed education, training, and care to prevent these problems from reoccurring, particularly those related to his alcohol abuse. This sentence adequately reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public, avoids unwarranted sentencing disparities among similarly situated defendants, and otherwise fully reflects each of the factors embodied in 18 U.S.C. § 3553(a). This 30-month sentence is still a serious sentence and is only a slight variance from the advisory guideline range, which is why the Court believes the sentence reflects the seriousness of the offense and promotes respect for the law. For the same reasons, this slight variance will not create unwarranted sentencing disparities among similarly situated defendants; the variance can be justified by Bush's tragic background and substance abuse problems. While the Court's task, as a district court, is not to arrive at a reasonable sentence -- it is to come up with one that reflects the factors in 18 U.S.C. § 3553(a), see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." (citation omitted)) -- the Court believes this sentence is reasonable. And perhaps most important in this calculation, the Court believes that this sentence is sufficient without being greater than necessary to comply with the purposes of punishment Congress set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-

473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.).  The Court sentences

Bush to 30-months imprisonment.

    **IT IS ORDERED** that the requests in the Defendant's Sentencing Memorandum Filed

Under Seal, filed October 3, 2011 (Doc. 34), are granted in part and denied in part.  The Court will

deny a departure under U.S.S.G. § 5K2.13 for diminished capacity.  The Court will deny a departure

under U.S.S.G. § 5H1.4 based on Defendant John A. Bush, Jr.'s alcohol abuse.  The Court will

accept the parties' stipulation that U.S.S.G. § 3C1.2 does not apply to this case.  The Court will vary

downward on Bush's sentence to a sentence of 30-months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
  United States Attorney
Kimberly A. Brawley
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

James C. Loonam
  Federal Public Defender
Federal Public Defender Office
District of New Mexico
Albuquerque, New Mexico

     *Attorney for the Defendant*